7 192
51 1281

## UNION TOWBOAT COMPANY v. LOUIS BORDELON, Auditor, &c.

The act of the Legislature of the 3d of March, 1847, investing the tax collector with the authority to seize and sell the property of a defaulting tax debtor, to satisfy his tax, is not in violation of that article of the Constitution of the United States, which provides, that no person shall be deprived of life, liberty or property, without due process of law; for the act itself points out, precisely, that very process of law by which the defaulting tax debtor may be deprived of his property.

Nor does that act, from the fact that the tax collector is empowered to seize and sell the property of a defaulting tax debtor to pay his tax, without the aid or intervention of the judiciary, violate the Constitution of the State. For, by the Court: it is true, as contended, that the functions of our departments of government are kept distinct, and the executive cannot divest judicial process. But the assessment of taxable property and the collection of taxes, are legal proceedings or process, but not judicial proceedings or process. If these proceedings take place illegally, as supposed in the present case, then the functions of the judiciary may be invoked, but not otherwise.

The tax levied on a steam towboat belonging to a company, the object of which is "towing vessels by steam in and out to sea and up and down the river Mississippi, and carrying freight and passengers in like manner; also wrecking or lightening vessels in said river or sea, and carrying freight and passengers in the Gulf of Mexico, and elsewhere at sea," is not in contravention of Article 1st, section 8, of the Constitution of the United States, which gives Congress power to regulate commerce with foreign nations, and among the several States.

The exigencies of government require that the process for the collection of taxes, should be summary. They are to be regarded not as a debt, to be enforced against the debtor who contracted it, by judicial proceedings, but a contribution required from the citizen for the support of government, and for the protection and benefit of all.

APPEAL from the Second District Court of New Orleans, *Lea*, J. *Hunton* and *Bradford*, and *Benjamin* and *Micou*, for the plaintiff: The 1st and 2d articles of the Constitution of the State of Louisiana, provide that "the powers of the government shall be divided into three distinct departments, and each of them be confided to a separate body of magistracy;" "and that no one of these departments, nor any person holding office in one of them, shall exercise powers properly belonging to either of the others, except in instances expressly directed or permitted.

The only articles of the Constitution, which refer to the levying of taxes, are the 32d article, which declares, that "all bills for raising revenue, shall originate in the House of Representatives, &c.;" and the 127th article, which provides, that "taxation shall be equal and uniform throughout the State, &c."

It thus appears, that the separation of the different departments of the government, by our Constitution, is express and positive; and is accompanied by an inhibition, upon each department, for the exercise of any powers, properly belonging to the others; and that, while the power to levy taxes is recognized as appertaining to the legislative department, the Legislature is left to provide for their collection, under the restrictions which result from the division of the powers of the government among the different departments.

It thus becomes an important question, to demand to which department of the government it properly belongs, to authorize and enforce the compulsory collection of taxes.

It is certainly competent for the Legislature to provide for the mode in which taxes shall be assessed. When the assessment has thus been made, it may be considered as sufficient *primâ facie* evidence, at least, of a debt to the State, from the citizen on whom the tax is imposed. But if the citizen neglects or refuses to discharge this debt, how is the payment of it to be enforced? In what respect does a debt to the State differ from a debt to an individual, as regards the process for its collection? It is said, by the judge of the court below, that "there is nothing in the Constitution which prescribes the particular process of law, by which persons may be divested of their property;" but certainly it must be by some "process of law," in virtue of a competent authority. If a collector of taxes can be authorized to proceed, by a summary seizure, for the recovery of a debt to the State, it is not easy to see why an individual may not be authorized to proceed in the same way. It belongs essentially to the judicial power of the government, to grant the proper remedy and aid to the State, as well to individuals, for the enforcement of the legal claims; and any statute which authorizes a mere ministerial officer, to proceed directly to the seizure of the property of the citizen, is believed to be an infringement of the powers of the judiciary.

If it be conceded, that the Legislature has the unquestionable power to prescribe in what mode taxes shall be assessed, and to erect the taxes so assessed into a privileged claim upon the property charged with them, yet it would seem to be the peculiar province of the judiciary, to authorize and direct the sale of the property for their payment. To grant such authority, is essentially an act of a judicial character. It was so held under a Constitution, having similar provisions with our own, in a case in 10 Yerger's Reports, 59. The power, then, to grant such authority, must vest in the judiciary, and can be vested no where else. It must be exercised by the judiciary, and cannot be exercised by any other class of magistracy. Any act of the Legislature, therefore, which assumes to grant such authority directly to a collector of taxes, is clearly in contravention of the 1st and 2d articles of the Constitution of this State.

It may be further observed, that the section 5th of the revenue act of 1847, imposes a fine, in certain cases, on any person or corporation who shall be indebted to the State for any tax, license or commission, and who shall have refused or neglected to pay the same, after final judgment has been rendered therefor. It seems, then, that in the case of a tax upon any trade or profession, the amount of the tax is considered as a debt, and that it can only be recovered after final judgment. But in what does a tax on a trade or profession differ from a tax on property, as to the nature of the liability they created, or as to the proper and constitutional method of enforcing its discharge? If a final judgment is necessary in the one case, why is it not equally necessary in the other?

It will be found, that the modes of enforcing the collection of taxes in the different States, vary as widely as the Constitutions of those States; and it is

impossible to reason from the method pursued in one State, to the method pursued in another, unless the Constitutions and laws of those States are first ascertained to be similar. There is nothing in the Constitution of the United States, to restrain the Legislatures of the several States from the exercise of judicial powers; and where no such restrictions are found in the Constitution of the particular State, the Legislature itself may well exercise such powers or it may delegate them to such magistrates as it may deem proper. It is only in the States that have specially provided for a careful distribution of powers among the different branches of the government, that the question can arise.

The only remaining question in this case, arises upon the proper construction of the 1st article of the 8th section of the Constitution of the United States. By that article, Congress is invested with the power "to regulate commerce with foreign nations, and among the several States." It is well settled, that the power to regulate commerce, includes the power to regulate navigation and intercourse; and that this power is exclusive. Under this power, Congress has passed laws for the enrollment and licensing of vessels, when so enrolled and licensed, all vessels are entitled to engage in the commerce among the several States, without restraints or impediments from State legislation. But if the several States have the power to levy taxes on vessels so engaged, they may easily defeat the rights acquired under the sanction of Congress. All right of taxation, is in its nature unlimited, and an unlimited right to tax, is a power to destroy. 4 Wheaton, 484. 9 Wheaton, 562. 12 Wheaton, 419. 7 Howard, 283.

It is believed that these decisions, and the cases referred to in these decisions, go far to sustain this position, if not decisive of it. But it is proper to refer the court to a decision, upon this subject, in 3 Hill 14, *Howell* v. *State of Maryland*.

*Isaac Johnson*, Attorney General, for the State.

By the court:

PRESTON, J. The State claims from the Union Towboat Company, a tax amounting to $392 66, on the capital stock of the company, and in default of payment, the tax collector of the district in which the capital of the company was assessed, seized, and was about to sell, one of the boats of the company to satisfy the demand of the State.

He has been enjoined on several grounds, two of which, alone, have been relied upon in this court, and have been discussed by the counsel of the plaintiffs, and the attorney general.

It is contended, that the seizure of the property of the company, is in itself illegal, because it was not authorized by any judicial proceedings, and any act of the Legislature, authorizing the collector of taxes to make such seizure, without the aid or intervention of the judiciary of the State, is unconstitutional.

The 49th section of the act, approved the 3d of March, 1847, "to provide a revenue for the State," under which the tax was laid and about to be collected, expressly authorized the collector, if the tax was not paid by the tax payer, to seize and sell his property to satisfy the tax.

It is argued, that this legislation violates the 5th article of the amendments to the Constitution of the United States, which provides, that no person shall be deprived of life, liberty or property, without due process of law. It may be a question, whether the article is not limited in its application to criminal proceedings.

But conceding that it prevents the divestiture of private property in all cases, without due process of law, the section of the act of 1847 quoted, points out, precisely, the process of law by which a defaulting tax payer may be deprived of his property in satisfaction of the taxes due by him. The exigencies of government require, that the process for the collection of taxes should be summary. The taxes are not, as supposed in argument, a debt to be enforced against the debtor who contracted it, by judicial proceedings, but a contribution required

from the citizen by the government, established for the protection of all, for its support, and without which contribution it could not be supported. Its speedy collection too, is generally indispensable to the success of the government and prosperity of the people; and it is often laid in such small sums, that judicial proceedings to collect it would be absurd.

The tax collectors have been authorized by law, from the foundation of the government, to collect taxes in this summary manner. They have always sold property in the summary manner prescribed by such legislation, to enforce the collection of taxes. Their authority and their sales, have always been recognized as constitutional and legal by our judiciary, and every other department of the government and the whole people, without imagining that the Constitution of the United States was violated. Under the acts of Congress for laying and collecting direct taxes, to which the provision in the Constitution would certainly apply, if it applies to State laws, the collectors were directed to proceed by distress and sale of the property of the defaulting tax payer, and their process has been recognized and sanctioned by the Supreme Court of the United States. The objection to the process has been, for the first time as far as we know, seriously urged in this case, and to it we reply, *communis error facit jus*.

It is true, as contended, that the functions of our departments of government are kept distinct, and the executive cannot divest judicial process. But the assessment of taxable property, and the collection of taxes, are legal proceedings or process; but not judicial proceedings or process. If these proceedings take place illegally, as supposed in the present case, then the functions of the judiciary may be invoked, but not otherwise.

It is next contended, that the tax levied upon the property of the plaintiffs in injunction, is in contravention of Article 1, section 8, of the Constitution of the United States, which gives Congress power to regulate commerce with foreign nations and among the several States. The tax is levied on the capital of a company, the object of which is expressed in the first article of the association: "That the operations of the said company shall be, the towing vessels by steam in and out to sea, and up and down the river Mississippi, and carrying freight and passengers in like manner; also wrecking or lightening vessels in said river or at sea, and carrying freight and passengers in the Gulf of Mexico and elsewhere at sea."

It is said that the tax is a regulation of commerce, and conflicts with the power of Congress to regulate commerce with foreign nations and among the several States, which it is contended is exclusive.

We were inclined, when this case was submitted, to have expressed an opinion as to the respective rights and powers of the General and State Government, under this article of the Constitution, without reference to authority, the opinions of the courts of the United States being unsettled upon the cases arising under it; and if the tax had been laid upon a boat or vessel carrying on commerce with a sister State, it would have been a fit occasion.

But, upon examination, we find the tax laid not upon a boat carrying on commerce with a sister State, but upon the capital of a company organized under our general corporation act, in fact created by the State of Louisiana, and of course subject to the conditions which the State may impose.

The capital of the company is property, and the Constitution of the State requires an equal and uniform tax to be imposed upon it with the other property of the State, for the support of government. The capital of the company stands

upon the same footing as the capital of insurance, or banking, or railroad, or other companies, or the capital of individuals.

We cannot conceive, then, that a question can arise under the article of the Constitution of the United States quoted. All taxation upon property within one State, may remotely affect its commerce with a sister State. Thus, a tax upon stores may increase the price of merchandise brought here by merchants from abroad; a tax upon warehouses, the price of the storage of produce from the western States; and a tax upon our markets may enhance the price or perhaps curtail the quantity of supplies brought to them. Yet these taxes have never been questioned. It is only when a regulation of commerce by a State directly affects commerce with a sister State, that a question can arise whether the grant to Congress to regulate commerce between the States is exclusive.

It was therefore decided by the Supreme Court of the United States in the case of the *State of Louisiana* v. *Nathan et al.*, that a tax upon a dealer in exchange, foreign as well as domestic, did not contravene the article of the Constitution invoked, 8 How. 73; and in *Magio's heirs* v. *Grima*, that a tax upon successions going to foreigners did not, *Ib.* 490; and in the case of the *Providence Bank* v. *Billings and Pittman*, that a State had power to tax a bank, there being no clause in the charter exempting it from taxation.

The language of Chief Justice Marshall, in that case, is conclusive of the present: "That the taxing power is of vital importance; that it is essential to the existence of government, are truths which it cannot be necessary to reaffirm. They are acknowledged and assented to by all. It would seem that the relinquishment of such a power is never to be assumed. We will not say that a State may not relinquish it—that a consideration sufficiently valuable to induce a partial release of it, may not exist. But as the whole community is interested in retaining it undiminished, that community has a right to insist that its abandonment ought not to be presumed in a case in which the deliberate purpose of a State to abandon it does not appear." 4 Peters, 561.

In fact, it was laid down in the Federalist, in expounding the contemplated Constitution, to induce its adoption: "that the States would possess an independent and uncontrolable authority to raise their own revenue for the supply of their own wants, and with the single exception of duties on imports and exports, would, under the plan of the Constitution, retain that authority in the most absolute and unqualified sense. And that an attempt on the part of the general government to abridge them in the exercise of it, would be a violent assumption of power unwarranted by any article or clause in the Constitution. This extract is from No. 32 of the Federalist, the production of Hamilton; but it may be seen by other numbers, the productions of Madison and Jay, that the principles were fully concurred in by them.

The question in this case is one as to taxation and subject to these principles. The question whether the power granted to Congress to regulate commerce between the States is an exclusive power, does not arise. And although the case has probably been presented to obtain the opinion of the court on this question, we do not think it proper to express a formal opinion on so important a subject when the case under consideration does not require it.

The judgment of the district court is affirmed, with costs.