TERRITORY OF MONTANA, respondent, *v.* FARNSWORTH, appellant.

COMMERCIAL TRAVELER— *Who is — Must pay license.*— An agent carrying samples of his principal's merchandise, and soliciting orders for his goods, who exhibits the samples to, and solicits and obtains an order for goods of the same character as the samples from a third person, is a commercial traveler, within the meaning of the act of July 22, 1879, and must, before carrying on such business, obtain the license required by the act.

SAME — *Act requiring license is constitutional.*— The act of July 22, 1879, requiring every commercial traveler, . . . selling, or offering to sell, any goods, wares or merchandise, to be delivered at a future day, to obtain a license before carrying on such business, in each county where such business may be transacted, is not in conflict with either of those clauses of the United States constitution providing that " the citizens of each state shall be entitled to all the privileges and immunities of the citizens of the several states," that congress shall have power " to regulate commerce with foreign nations and among the several states, and with the Indian tribes," and that "no state shall, without the consent of congress, lay any impost or duties on imports and exports, except that may be absolutely necessary for exercising its inspection laws."   And this is so, although the person pursuing the occupation of a commercial traveler is a citizen of another state, and the goods sold or offered for sale by him are situated and manufactured in another state.

SAME — *License not a duty or impost upon imports.*— Such statute only imposes a tax upon the business or occupation of the commercial traveler, and is the price exacted by the territory for the privilege allowed by it of pursuing within its limits a particular trade, business or avocation; it does not lay a duty or impost upon imports.   .

*Misdemeanor need not be prosecuted by indictment.*— A misdemeanor is not a capital or other infamous crime, within the meaning of the fifth amendment of the United States constitution, and need not be prosecuted by presentment or indictment by a grand jury.

*Appeal from First District, Gallatin County.*

SANDERS & CULLEN, for appellant.

This is an appeal from the judgment of the district court in and for Gallatin county, finding the defendant guilty and assessing against him a fine for a violation of the act approved July 22, 1879, found on page 5 of the Montana laws of the extraordinary session, on an agreed statement of facts.

While the law is artfully drawn so as to discriminate against perambulating salesmen, and in its enforcement is made to discriminate against non-resident salesmen, and is as to them therefore void, we rest the case mainly on two propositions:

1st. That by the agreed statement of facts defendant is not brought within the letter of the law, and therefore is not guilty.

2d. That the act is upon a subject, which, as it affects the defendant, is by section 8, article II, of the constitution of the United States, withdrawn from the legislation of the states, and confided to congress, and which congress by non-action has willed shall be free.

Of these in their order.

The condemnation of the law is visited upon those who are guilty of "selling" or "offering to sell" goods, and the question to be determined is, what is a "sale?" Several things are requisite to a sale which will be hereafter more particularly specified, but one test is supreme in determining whether there has been a "sale" or not, and that test is, whether the property in the goods has passed to the vendee. So long as the title remains in the vendor or his principal, no goods have been "sold." So long as a party does not offer to transfer the title, he does not "offer to sell." Until the defendant has passed the title to the property, or offered to do so, he cannot be convicted of "selling" or "offering to sell."

The supreme court of the United States very accu-

rately defines a sale in the case of *Williamson et al.* v. *Berry*, 8 How. 544, and in that case, like the case at bar, it was construing the word when found in a statute. It says, " we remark that *sale* is a word of precise legal import both at law and in equity. It means at all times a contract between parties to *give* and to *pass* rights of property for money." See, also, *Huthmacher* v. *Harris*, 38 Penn. 498; *Mackaness* v. *Long*, 85 Penn. 158–163; *Edwards* v. *Cottrel*, 43 Iowa, 194–204; *Patten* v. *Smith*, 5 Conn. 196–199.

The agreed facts show that there was no payment or offer to pay, no delivery or offer to deliver, no pretense of an agreement that the property or title in any goods should pass. To say in the face of these facts that Farnsworth was " selling " or " offering to sell " goods is an absurdity, for the facts agreed on show he had no authority to sell and did not pretend to have, but explicitly disclaimed authority to " sell " or " offer to sell " goods.

If it is claimed that he sold goods, possibly the district attorney will tell us to what goods the title passed; or if it is claimed that he offered to " sell " goods, the learned attorney-general will tell us what goods he offered to transfer the title to.

The findings expressly show that he was securing an option for his employers; that no sale, no payment, no delivery, no transfer of title, was to take place until the proposition was considered in St. Paul by his employers, assented to by them, and the delivery made there at the depot of the Northern Pacific Railroad Company. To characterize such a transaction as a " sale," or as " offering to sell," is to disregard the authority of the dictionary.

This is a criminal statute, highly penal in its character, arresting a large branch of incipient commerce, born of a desire for monopoly, and no man should be brought within its purview by implication, loose interpretation or perversion. It is to be strictly construed.

The agreed statement of facts shows that the defendant, in and about the matters alleged in the complaint against him as a crime, was engaged in inaugurating commerce between Montana and Minnesota.

In its application to the case at bar the territory of Montana has claimed the right to nip in the bud commerce between Montana and Minnesota. It has in effect said there shall be none such except on our terms; for if we may tax the incipient stage of that commerce in this form, we may tax it in any other form it may assume; and if, as Chief Justice Marshall says, the power to tax is the power to destroy, and that power is confided to the states, the provision of section 8, article II, of the constitution, which provides that "the congress shall have power to regulate commerce : . . among the several states," is a futile provision.

It does not matter that by the terms of the statute there is no discrimination between the citizens of this territory and the citizens of another territory or the states. If it can be fairly gathered from the whole act that it was the intention of the legislature to regulate interstate commerce, then it is void for the reason that the power so to regulate this species of trade is by the constitution expressly confided to congress. As well might the legislature of the territory attempt to arrogate to itself any other matter embraced in that section enumerating the powers granted to congress; as, for example, the coining of money, the establishment of post-offices and post-roads or the declaration of war, as to attempt to regulate interstate commerce. Nor can anything be assumed by reason of the fact that congress has not seen fit to exercise the power granted to it. Says Mr. Justice Field, in *Wilton* v. *State of Missouri*, 1 Otto, 282: "The fact that congress has not seen fit to prescribe any specific rules to govern interstate commerce does not affect the question. Its inaction on this subject, when considered with reference to its legislation with

respect to foreign commerce, is equivalent to a declaration that interstate commerce shall be free and untrammeled."

This act is leveled at commercial travelers, and only persons engaging in this calling are subject to its provisions.    Can commerce between the state of Minnesota and the territory of Montana be said to be free and untrammeled as long as a commercial traveler from the city of St. Paul is compelled to pay a tax of $25 in each county in the territory in which he sells or offers to sell goods?    But it may be argued that this is not a tax upon commerce, not a tax upon the merchandise imported into Montana from the state of Minnesota, but is a license tax levied upon the person exercising this particular vocation.    The eminent jurist above quoted disposes of this sophistry in the following manner: "The general power of the state to impose taxes, in the way of license, upon all pursuits and occupations within its limits is admitted, but, like all other powers, must be exercised in subordination to the requirements of the federal constitution.    Where the business or occupation consists in the *sale* of *goods*, the license tax required for its pursuit is in effect a tax upon the goods themselves."    *Wilton* v. *State of Missouri*, 1 Otto, 278.

It does not matter whether the attempt to regulate interstate commerce appears so plainly upon the face of the act itself as that the court can say that it was the intention of the legislature so to attempt to regulate the same; if, by the operation of the law, it imposes a burden on interstate commerce, which, as we have seen, congress willed should be free, then the act is unconstitutional and void.    "Whatever may be the power of a state over commerce that is completely internal, it can no more prohibit or regulate that which is interstate than it can that with foreign nations."    *Railroad Company* v. *Husen*, 95 U. S. 469.

It does not seem necessary to pursue these questions

farther, and we submit it with confidence upon the two propositions:

*First.* That the record does not show a sale, or an offer of sale; and

*Second.* That it does very clearly appear that the act under which the prosecution is brought operates to restrict interstate commerce, and is, therefore, unconstitutional. If this law can stand, then it would be competent for the legislature to pass an act requiring every merchant from the city of St. Paul coming into this territory for the purpose of selling goods to pay a license tax of $25 in each county for the privilege of doing so. Stripped of all verbosity and superfluities, the question actually submitted for determination in this case is, Can the legislature do that indirectly which it may not do directly?

J. A. Johnston, District Attorney, for respondent.

The constitutional provision, "that no state shall, without the consent of congress, levy any impost or duty on imports or exports, applies only to goods brought into any state from a foreign country," and has no application to property brought from one state into another; hence this constitutional provision does not prohibit a state or territory from taxing articles brought into it for sale from another state. *Woodruff* v. *Parham*, 8 Wall. 123; *Hinson* v. *Lott*, id. 148. These cases seem decisive of any question presented in this record.

A uniform tax such as this is, which makes no discrimination between residents and non-residents, is, therefore, not subject to the criticism of the court in *Wood* v. *Maryland*, 12 Wall. 418. There can be nothing found in this law repugnant to the constitution. *Munn* v. *Illinois*, 4 Otto, 113; 3 id. 99; *Reading Railway Co.* v. *Pennsylvania*, 13 Wall. 284. All property of every kind and character must pay its quota of taxes. 4 Abbott's National Digest, secs. 21, 22, 23, and authorities cited.

It is submitted that, if such non-resident owner is un-

willing to pay for such security or protection, there is nothing in the constitution or laws of any country, or any rule of decision or of practice in any court, to prevent him from withdrawing his property and business from such state or territory, and thus relieve himself from the payment of the tax so unreasonably complained of.

GALBRAITH, J.   This is an appeal from a judgment rendered by the court of the first judicial district, affirming the judgment of the probate court of Gallatin county, whereby a penalty of $50 was imposed upon the appellant for the violation of an act " to provide for licensing commercial travelers," approved July 22, 1879, and hereafter given.   In this case, the following facts were agreed upon:

1. That the defendant was, at the time alleged in the complaint herein, a commercial traveler engaged at Livingston, Gallatin county, Montana, in conducting his said vocation, as follows, and not otherwise.

2. That Auerbach, Finch & Van Slick are a mercantile firm, resident at St. Pau¹, in the state of Minnesota, engaged there in the sale of goods, wares and merchandise, where each member of said firm resides, each being a citizen of the United States, and also of the said state of Minnesota.

3. That the goods belonging to said firm for sale are at said St. Paul, and were at said St. Paul at the time of the commission by the defendant of the acts herein found to have been committed.

4. That the defendant was then, and ever since hath been, a citizen of the United States, and a resident of the state of Wisconsin, and a citizen thereof.

5. That as a commercial traveler for said Auerbach, Finch & Van Slick, with samples of their goods aforesaid, in said St. Paul, said defendant, on the —— day of May, 1883, came to Livingston in said Gallatin county, where he did exhibit said samples of said goods, and did

represent and affirm them to be fair samples of the goods then owned and possessed in said St. Paul by said Auerbach, Finch & Van Slick, and which said goods then were there, to wit, at said St. Paul, and there had for sale; and did then and there, to wit, at Livingston aforesaid, on the date aforesaid, solicit of one John Doe, then and there being a merchant, that he give to said defendant an order for divers and sundry of the said goods, wares and merchandise of said Auerbach, Finch & Van Slick, then being at St. Paul as aforesaid, and did then and there obtain such order, and did then and there agree that the said defendant would forward the said order to the said Auerbach, Finch & Van Slick, and that if said order should be accepted by said Auerbach, Finch & Van Slick, said goods, in said order mentioned, would be delivered to said John Doe at the warehouse of H. R. R. Co., at St. Paul, to be shipped to said John Doe, at Livingston aforesaid; and that said Auerbach, Finch & Van Slick were at liberty to reject or accept the order.

6. That none of said goods were then and there delivered at Livingston aforesaid; nor was it the agreement or understanding that the same were to be then and there delivered, but it was agreed that the said order was to be by said defendant forwarded from said Livingston to said St. Paul as aforesaid, when and where the said goods were to be shipped from Minnesota to Montana as aforesaid.

7. That the defendant, as aforesaid, was the instrumentality by which Auerbach, Finch & Van Slick consummated as well as inaugurated the transaction aforesaid, by means whereof they obtained said order for the sale of their goods, should they accept said order and sell said goods.

8. That for the foregoing business the defendant did not at first, or at all, obtain a license from the treasurer of Gallatin county.

It is claimed that the above facts "do not bring the

defendant within the purview or provisions of the fore-going act." This act, or so much thereof as it is neces-sary to quote, is as follows: "Every commercial traveler, agent, drummer or other person, selling, or offering to sell, any goods, wares or merchandise of any kind, to be delivered at some future time, or carrying samples and selling or offering to sell goods, wares and merchandise of any kind similar to said samples, to be delivered at some future time, shall, before carrying on such business, pay a license therefor of $25 in each county where such business may be transacted. Such payment shall be made to, and such license issued by, the county treasurer, and the license so issued shall authorize the person named therein to carry on said business of a commercial traveler in said county for the period of three months from the date thereof. And it is hereby made the duty of every jus-tice of the peace, constable, sheriff, and all peace officers, to demand the license of any such commercial traveler, drummer, agent, or other person, who has sold, or is offering to sell, goods, wares or merchandise in his county, and if such person be found not to have a license as required by this act, or if, upon demand made by any such officer, he shall not exhibit the same, the person so offending shall be guilty of a misdemeanor, and upon conviction thereof shall be fined in any sum not less than $50 nor more than $100, in the discretion of the court."

The agreed statement of facts, stripped of its verbiage and condensed into a form sufficiently comprehensive to present the question raised, is in substance as follows:

B. is engaged in the sale of merchandise. A. is a com-mercial traveler, carrying samples of B.'s merchandise, and his agent to solicit orders for his goods. A. exhibits the samples to, and solicits and obtains an order for goods of the same character as the samples from C. This constitutes an offer by A. to sell the goods.

The above state of facts must have this signification,

if agency, acts and words have any meaning. It is not necessary, in order that the offer to sell should be within the provision of the statute, that the goods should be the property of A. It is sufficient if the offer be to sell any goods, wares or merchandise. We are, therefore, of the opinion that the facts stated bring the appellant within the meaning of the above statute.

The transcript shows that this case was commenced in the probate court in Gallatin county, which had jurisdiction thereof, upon a complaint filed therein. This is in accordance with the laws of this territory. "Prosecutions in the probate court, or justice of the peace courts, shall be by complaint." Sec. 5, 3d div. Crim. Prac. R. S. 288. This is a bare misdemeanor; it is not "a capital, or otherwise infamous crime," as mentioned in section 5 of the amendments to the constitution of the United States. A presentment or indictment by a grand jury was, therefore, not required.

The principal question, however, presented is whether or not this act is in conflict with the constitution of the United States.

It is contended: First — That this act is in conflict with that clause in the constitution which provides that "the citizens of each state shall be entitled to all the privileges and immunities of the citizens of the several states." And also with those provisions thereof which provide that congress shall have power "to regulate commerce with foreign nations and among the several states, and with the Indian tribes." And that "no state shall, without the consent of congress, lay any impost or duties on imports and exports, except what may be absolutely necessary for exercising its inspection laws."

The presumption is always in favor of the validity of an act of the legislature, and the burden is upon the party claiming that it is otherwise, to show that it is so, clearly and satisfactorily. An act should not be adjudged unconstitutional except where it is plainly repugnant to

the fundamental law. In a case of this kind, it is only with the power of the legislature viewed in relation to the fundamental law, and not with the expediency or propriety of its legislation, that the court has to do. These are matters for the consideration of the legislature itself, when it enacts the law.

We do not think that the act is in conflict with the first clause of the constitution above quoted, as it does not discriminate against the citizens of other states and territories. We can see no reason why this territory cannot subject all persons who come within its jurisdiction, although citizens of other states and territories, for the purpose of engaging in the kind of business mentioned in the act, to the same conditions as to payment of a license tax therefor as are imposed upon its own citizens. The act requires the payment of a license for the purchase of a privilege to do the kind of business mentioned therein, just as in the case of licenses required by law to be purchased for the privilege of pursuing a particular trade, profession or occupation. The act is not obnoxious to the objection that it is discriminating, for its provisions apply to all persons pursuing the occupation mentioned therein alike, whether citizens of other states and territories or of the territory of Montana; and to the goods, wares and merchandise of this territory as well as those of foreign production and manufacture. The act does not, therefore, come within the purview of the decision of the supreme court of the United States, in *Wood* v. *Maryland*, 12 Wall. 418, where it was held that a statute of the state of Maryland was unconstitutional as discriminating against the citizens of other states, which "made it a penal offense in every person, not being a permanent resident in the state, to sell, offer for sale, or expose for sale, within certain limits in the state, any goods, wares or merchandise whatever, other than agricultural products and articles manufactured in Maryland within the said limits, either by card, sample

or other specimen, or by written or printed trade list, or catalogue, whether such person be the maker, or manufacturer, or not, without first obtaining a license so to do." This statute plainly imposed a discriminating tax upon persons trading in the manner mentioned therein, within certain limits in the state, who were residents of other states. And it was solely upon this ground that the statute was declared unconstitutional; and Justice Clifford, delivering the opinion of the court, says: " Taxes, it is conceded, in those cases (referring to *Woodruff* v. *Parham*, 8 Wall. 139, and *Hinson* v. *Lott*, id. 151), may be imposed by a state on all sales made within the state, whether the goods sold were the produce of the state imposing the tax, or of some other state, provided the tax imposed is uniform; but the court, at the same time, decides that a tax discriminating against the commodities of the citizens of the other states of the Union would be inconsistent with the provisions of the federal constitution; and the law imposing such a tax would be unconstitutional and invalid."

No question is made in this case as to the uniformity of the tax; and it does not discriminate against either the persons or property of other states. Neither in respect to discrimination is the act under consideration similar in any way whatever to the act declared unconstitutional in the case of *Wilton* v. *Missouri*, 91 U. S. 275. The act in question, in that case, required "the payment of a license tax from persons who deal in the sale of goods, wares or merchandise which are not the growth, product or manufacture of the state, by going from place to place, to sell the same, in the state; and required no such license tax from persons selling in a similar way goods which were the growth, produce or manufacture of the state."

The statute in question differs from the one in the case above stated, in that it does not discriminate against " the sale of goods, wares and merchandise which are not

the growth, product or manufacture of this territory."
It was upon the ground of discrimination that this case
was decided.

At the close of his opinion in this case, Field, justice,
speaking for the court, says: "As the main object of
that commerce, *i. e.*, interstate commerce, is the sale and
exchange of commodities, the policy thus established
would be defeated by discriminating legislation like that
of Missouri." And then, referring to the case of *Wood-
ruff* v. *Parham*, *supra*, continues: "Mr. Justice Miller,
speaking for the court, after observing, with respect to
the law of Alabama, then under consideration, that there
was no attempt to discriminate injuriously against the
products of other states, or the rights of their citizens,
and the case was not, therefore, an attempt to fetter
commerce among the states, or to deprive the citizens of
other states of any privilege or immunity, said: 'But a
law having such operation would, in our opinion, be an
infringement of the provisions of the constitution which
relate to those subjects, and, therefore, void.'"

The act of the legislature in question, unlike those
declared unconstitutional in both of the above cases,
does not discriminate between persons who are citizens
of this territory and citizens of other states and territo-
ries, or between goods, wares and merchandise which are
the product and manufacture of other states and terri-
tories, and which are the product and manufacture of
this territory. It is not, therefore, in our opinion, in
conflict with that clause of the constitution of the United
States which provides that "the citizens of each state
shall be entitled to all privileges and immunities of citi-
zens of the several states."

It remains to consider whether or not this act is in con-
flict with those provisions of the constitution of the
United States, that congress shall have power "to regu-
late commerce with foreign nations and among the sev-
eral states," and that "no state shall, without the consent

of congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws."

The act requires the payment of a license fee for each county in which the business of selling by sample is conducted, which license is to continue in force for the period of three months from its date. In respect to the changes of the constitution referred to, a state is as much subject to these restrictions as a territory. Therefore, the reasons which apply in the one case are applicable, also, in the other. As a general rule, the right of taxation is one of the incidents of sovereignty, and is co-extensive with its exercise. The right of taxation by the state, therefore, in the absence of any constitutional limitation, extends to all objects which are subjected to its sovereignty. To say that a state cannot tax an individual within its jurisdiction, and carrying on an occupation within its limits, would be a denial of its sovereignty as a state. The individual is within the jurisdiction of the state; his business is carried on within its limits; both himself and his occupation are protected by the state; and his occupation may, therefore, be the lawful subject of state taxation.

"Taxation only exacts a contribution from individuals of the state . . . for which they receive compensation in the protection which government affords. . . ." *County of Mobile* v. *Kimball*, 102 U. S. 691.

The only exception to this general rule in the case of the state is where the constitution has reserved to the general government the right "to regulate commerce with foreign nations, among the several states, and with the Indian tribes;" and prohibited any state from laying a duty on imports or exports, without the consent of congress, "except when absolutely necessary to execute its inspection laws."

The statute in question does not assume to regulate commerce; it does not prescribe rules for the conduct

of commercial transactions. It does not contemplate any restriction upon commerce. It simply imposes a tax upon an occupation exercised by all persons within the limits of the state. Neither does it impose any duty or imposts on imports. Certainly every duty or impost is a tax; but every tax is not a duty or impost within the meaning of that term as used in the constitution. It may be claimed that this tax is within the constitutional prohibition, because its tendency is to increase the price of the goods imported. But this proves too much. It has been universally conceded that after imported merchandise has been removed from the original package and mingled with other goods, that they are the subject of state taxation. "It is sufficient for the present to say generally that when the importer has so acted upon the thing imported that it has become incorporated and mixed up with the mass of property in the country, it has perhaps lost its distinctive character as an import and has become subject to the taxing power of the state." Chief Justice Marshall, in *Brown* v. *State of Maryland*, 12 Wheat. 419.

But the tendency of the tax in such a case is to increase the price of the goods as well. The tax in such a case enhances the price of the sale by the importer and its cost to the consumer; for it is the consumer, in the end, who must pay the tax. This fact, therefore, that the price of the goods is increased by the tax, is not the true criterion by which to determine the right to tax the occupation. No doubt every tax upon personal property or upon occupations, business or franchises, affects more or less the subjects and the operations of commerce. Yet "it is not everything that affects commerce that amounts to a regulation of it, within the meaning of the constitution." Justice Strong, in "State tax on railway gross receipts," 15 Wall. 284.

In this case it was held that a statute of a state imposing a tax upon the gross receipts of railroad com-

panies was not repugnant to the constitution of the United States; although such receipts came partly from freights received from transportation of goods from Pennsylvania into another state, or from such other state into Pennsylvania. Further on in the opinion the same judge says: "Is, then, the tax imposed by the act of February 23, 1866, a tax upon freight transported into or out of the state, or upon the owner of freight, for the right of thus transporting it? Certainly it is not directly. Very manifestly it is a tax upon the railroad company, measured in amount by the extent of its business or the degree to which its franchise is exercised. That its ultimate effect may be to increase the cost of transportation must be admitted. So it must be admitted that a tax upon any article of personal property that may become a subject of commerce, or upon any instrument of commerce, affects commerce itself. If the tax be upon the instrument, such as a stage-coach, a railroad car, or a canal or steamboat, its tendency is to increase the cost of transportation. Still, it is not a tax upon transportation or commerce. And it has never been seriously doubted that such a tax may be laid." So in this case the occupation taxed may be treated as one of the instrumentalities of commerce. The profits of the occupation are made within the limits of the territory imposing the tax; and the same reasons which are applicable in the case cited will also apply in the case at bar. The license fee exacted is not a tax upon the importer or the importation. It is the purchase of the privilege of engaging in the occupation of selling goods, wares and merchandise, just as may be exacted in the case of auctioneer, peddler, saloon-keeper, or other trade or profession.

We do not think that the decision in *Brown* v. *State of Maryland, supra,* applies to this case. In that case Brown was indicted, under a law of the state of Maryland requiring all importers of foreign articles to take out a license before selling the same, "for having im-

ported and sold one package of foreign dry goods with-
out license so to do." It was held that a tax upon the
sale by the importer of goods imported for sale in the
original package was a tax upon the goods themselves,
and in this respect a violation of the constitution in rela-
tion to the prohibition to a state to levy duties and im-
posts on imports. Also, that sale having been the object
of importation, the importation gave the right to sell the
goods imported in the original package, without taxation
by the state, and therefore repugnant to that clause of
the constitution in relation to the regulation of com-
merce. It is plain that, in such a case, the taxation of
the importer for a license to sell in the original package
is substantially a direct impost or duty on imports. It
makes no difference whether the tax is placed upon the
importer, in the way of a license to sell the original pack-
age, or directly upon the original package itself. In such
a case the power to tax could be exercised to such a de-
gree as in substance directly to prohibit the importation.
But in the case at bar the person following the occupa-
tion taxed is not necessarily the owner of the goods,
which it is claimed are indirectly taxed. His occupation
is simply one of the instrumentalities of commerce by
which sales are made within the meaning of the decis-
ion in "State tax on railway gross receipts," *supra.*
The tax is not a direct tax upon importation. It can
hardly be called an indirect tax. The license fee might
be made so exorbitant that it would prohibit the occupa-
tion and prevent the importation of goods. His occupa-
tion might cease entirely, and the business of importing
goods into the territory go on uninterrupted.

It will be remembered that in the rendition of the de-
cision in *Brown* v. *Maryland, supra,* the judges were not
unanimous. A strong dissenting opinion was rendered by
Thompson, justice. This decision has been frequently
referred to in subsequent cases before the same court;
and while it has been upheld as authority, yet that court
has often announced that its principles ought not to be

applied to any state of facts which do not come plainly within the facts stated in that case. The state of facts in the case at bar is essentially different from that of the case of *Brown* v. *Maryland.* In discussing the question as to whether or not an act of a state or territorial legislature is in conflict with the above provisions of the constitution, the supreme court of the United States has frequently declared that the lines marking the boundary between the right of taxation by the state and the power of the general government to regulate commerce and to limit the imposition of a duty or impost on imports and exports by the state is difficult to define. In *Brown* v. *Maryland, supra,* Chief Justice Marshall, referring to this distinction, says: "The power and the restriction upon it, though quite distinguishable when they do not approach each other, may yet, like the intervening colors between white and black, approach so nearly as to perplex the understanding, as colors perplex the vision in marking the distinction between them. Yet the distinction exists, and must be marked as the cases arise. Till they do arise it might be premature to state any rule as being universal in its application." Reference to the same figure of speech, and the use in substance of the above language, is had by Field, justice, in the case of *Wilton* v. *State of Missouri, supra.* In our examination of the cases which have come before the supreme court of the United States, in which this subject has been considered, with but one or two exceptions, the decisions have been made by a divided court. It would appear, therefore, that no general rule is applicable in relation to the exercise of these two powers; but that each case must be determined upon the facts as they are presented. "It is quite difficult, if not impossible, to draw any general line that will mark with any degree of precision where the commercial power of congress ends and where the power of each state begins." Hawley, C. J., in *Ex parte Robinson,* 12 Nev. 263.

In the case of *City of New York* v. *Miln,* 11 Pet. 136,

which was an action of debt brought in the circuit court of the state of New York to recover from the defendant the amount of certain penalties imposed by a statute of that state, Barbour, J., in delivering the opinion of the supreme court of the United States, and discussing the distinction which existed between the case then under consideration and that of *Brown* v. *The State of Maryland,* says: "It is difficult to perceive what analogy there can be between a case where the right of the state was inquired into in relation to a tax imposed upon the sale of imported goods and one where, as in this case, the inquiry is as to its rights over persons within its acknowledged jurisdiction. The goods are the subject of commerce, the persons are not. The court did, indeed, extend the power to regulate commerce so as to protect the goods imported from state tax, after they were landed and were yet in bulk. But why? Because they were the subject of commerce, and because, as the power to regulate commerce, under which the importation was made, implied a right to sell, that right was complete without paying the state for a second right to sell whilst the bales or packages were in their original form. But how can this apply to persons? They are not the subject of commerce, and not being imported goods cannot fall within a train of reasoning founded upon the construction of a power given to congress to regulate commerce, and the prohibition to the state from imposing a duty on imported goods."

We think that the state of facts in the case at bar brings it clearly within the boundary of the sovereignty of the territory. The right of taxation in such a case, as was said by the supreme court of Indiana, "is inseparable from sovereignty essential to its existence, and one which all expounders of the constitution admit to have been reserved." *Beall* v. *State,* 4 Blackf. 109.

"To pronounce such a law unconstitutional," says Hawley, C. J., in *Ex parte Robinson, supra,* a case relat-

ing to a similar statute to the one in question, "because it might, in some imaginable manner, affect the operations of commerce, would be to surrender the principle that a state has the right, for its support, to impose a tax upon citizens who are conducting business within its jurisdiction. Such a doctrine is not, in our opinion, sustained by the reasoning of any of the cases cited by counsel. On the other hand, while the facts in many of the cases referred to are different from the case at bar, the reasoning of the courts is decidedly in favor of the views we have expressed."

In the case of *Nathan* v. *The State of Louisiana*, 8 How. 82, where it was held that "a state law which imposes a tax on exchange and money brokers is not repugnant to the constitutional power of congress to regulate commerce," McLean, justice, delivering the opinion of the court, says: "The right of a state to tax its own citizens for the prosecution of any particular business or profession within the state has not been doubted. And we find that, in every state, money or exchange brokers, vendors of our own or foreign manufacture, retailers of ardent spirits, tavern-keepers, auctioneers, those who practice the learned professions, and every description of property not exempted by law, are taxed. . . . No one can claim an exemption from a general tax on his business within the state on the ground that the products sold may be used in commerce. . . . A cotton broker may be required to pay a tax upon his business, or by way of license, although he may buy and sell cotton for foreign exportation. . . . The taxing power of a state is one of its attributes of sovereignty. And where there has been no compact with the general government, or cession of jurisdiction for the purposes specified in the constitution, this power reaches all the property and business within the state which are not properly denominated the means of the general government; and, as laid down, it may be exercised at the discretion of the

state. The only restraint is found in the responsibility of the members of the legislature to their constituents. If this power of taxation by a state within its jurisdiction may be restricted beyond the limitations stated, on the ground that the tax may have some indirect bearing on foreign commerce, the resources of a state may be thereby essentially impaired. But state power does not rest on a basis so indefinable. Whatever exists within its territorial limits in the form of property, real or personal, with the exceptions stated, is subject to its laws; and also the numberless enterprises in which its citizens may be engaged. These are subjects of state regulation and state taxation, and there is no federal power under the constitution which can impair this exercise of state sovereignty."

In *Woodruff* v. *Parham,* 8 Wall. 123, it was held that "the term 'import,' as used in that clause of the constitution which says that 'no state shall levy any imposts or duties on imports or exports,' does not refer to articles imported from one state into another, but only to articles imported from foreign countries into the United States; and that therefore 'a uniform tax imposed by a state on all sales made in it, whether they be made by a citizen of it or a citizen of some other state, and whether the goods sold are the produce of that state enacting the law or of some other state, is valid.' "

In this case Miller, justice, speaking for the supreme court of the United States, and referring to a remark of Chief Justice Marshall, at the close of the opinion in *Brown* v. *Maryland, supra,* which was, "that we suppose the principles laid down in this case to apply equally to importations from sister states," says: "If the court then meant to say that a tax levied on goods from a sister state, which was not levied on goods of a similar character produced within the state, would be in conflict with the clause of the constitution giving congress the right 'to regulate commerce among the states,' as much

as the tax on foreign goods, then under consideration, was in conflict with the authority to regulate commerce with foreign nations, we agree to the proposition." See *Hinson* v. *Lott*, 8 Wall. 148, and *Waring* v. *The Mayor*, 8 Wall. 110.

We are of the opinion that the statute in question imposes a tax upon the business or occupation of the commercial traveler; that' such tax is the price exacted by the territory for the privilege allowed by it, of pursuing within its limits a particular trade, business or avocation; that it is not a duty or an impost upon imports. That the individual and his occupation, being within the boundary of the sovereignty of the territory, the right of taxation incident to, and co-extensive with, that sovereignty, attaches thereto.

The judgment is affirmed.